IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 18, 2017 Session

## STATE OF TENNESSEE v. DEEWAINE MIKEL BUMPAS

**Appeal from the Criminal Court for Davidson County**
**No. 2013-D-2827    J. Randall Wyatt, Jr., Judge**

_____

### No. M2016-00972-CCA-R3-CD

_____

In October 2013, the Davidson County Grand Jury indicted the Defendant-Appellant, Deewaine Mikel Bumpas, in count one for aggravated robbery occurring on June 19, 2013; in count two for attempted aggravated robbery occurring on June 26, 2013; and in count three for aggravated robbery occurring on July 3, 2013. The trial court, at the State's request, severed counts one and two, and the parties proceeded to trial on count three. A jury subsequently convicted Bumpas, as charged, of the July 3, 2013 aggravated robbery, and the trial court imposed a sentence of twelve years at 85% release eligibility. See T.C.A. §§ 39-13-402, 40-35-501(k)(1). On appeal, Bumpas contends: (1) the trial court erred in denying his motion to exclude the photographic lineup and accompanying testimony; (2) the trial court erred in denying his motion to exclude the surveillance video and accompanying testimony; (3) the trial court abused its discretion in sustaining the State's objection to questions regarding Sergeant Williams' personnel record; (4) the trial court erred in denying his motion for a mistrial; (5) the evidence is insufficient to sustain his conviction; (6) the trial court imposed an excessive sentence; and (7) the trial court abused its discretion in denying his motion for new trial.[1] We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, JJ., joined.

Celia Marie Stacey, Nashville, Tennessee, for the Defendant-Appellant, Deewaine Mikel Bumpas.

_____

[1] We have reordered the issues on appeal for clarity.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Glenn R. Funk, District Attorney General; and Amy Hunter and Addie Askew, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**Trial.**  Brittany Stokes testified that she was working at the Cash and Dash, a business offering cash advances as well as pay-day and title loans, when it was robbed at approximately 1:30 p.m. on July 3, 2013.  Stokes said that at approximately 1:30 p.m. that day, she was helping a customer, Ronnie Barrett, with paperwork to renew his loan.  As she assisted Barrett, a man whom she had never seen before entered and asked what he needed to do to obtain a pay-day loan.  Stokes said this man did not "come all the way in the door, he just opened [it] and kind of leaned in and looked around, [and] he was asking questions [while] he was looking, like he was scanning the place."  As this man peered in the door, Barrett gave Stokes several one-hundred-dollar bills to repay his old loan as well as a check for $240 to renew this loan, and Stokes gave Barrett two one-hundred-dollar bills.  After Stokes told the unidentified man what was required for a pay-day loan, he left.

Shortly thereafter, Jamie Calderon, the store manager, returned to the Cash and Dash.  A few moments later, the robber entered the business.  In addition to Stokes, Barrett, and Calderon, a state auditor named Robert Doyle was also present in the Cash and Dash during the offense.  Stokes saw the robber "jump" up the stairs, which caused her to gasp, and she was able to see the robber's entire face for approximately thirty seconds.  As the robber opened the door, he pulled a black bandana over his nose and mouth and raised his "small" gun.  The robber pointed his gun at her and demanded that she give him money from the business.  She stated that the robber was five feet, seven inches tall, weighed approximately 180 pounds, and had a light to medium complexion.  She recalled that the robber was wearing a white hat, "black shorts" and a "long-sleeve . . . black shirt" made of "long[]john material" that had a "graffiti type thing on the front" with "thumb holes," which she noticed because the robber had placed his thumbs through these holes.

When the robber demanded money and pointed the gun at her head, Stokes opened the cash drawer in her desk, and the robber took "between $400 and $600, maybe more."  Once he had emptied the drawer, the robber "demanded more money" and said he wanted the one-hundred-dollar bills he had seen.  The robber told Stokes that if she "did what he said[,]" she could "go home and see [her] kids that night."  When he made this statement, the robber was only a few inches from her face, which allowed her to observe the portion of his face that was uncovered.

- 2 -

When the robber took the money from Stokes's cash drawer, Doyle, the state auditor ran to the back of the store and got down on his knees and covered his head with his hands. The robber took Stokes to the back of the business and told her to go through the drawers for more money before demanding that Stokes and Doyle give him their wallets at gunpoint. Stokes said that because Doyle was wearing white pants, it was obvious that he did not have a wallet, and she asked the robber to leave him alone. Stokes also told the robber she did not have any money in her wallet, and when the robber insisted on more money, Stokes walked back to her desk and gave him two or three rolls of quarters, along with a bunch of loose quarters. As the robber walked out the door, he said, "Y'all have a good day." Stokes said the robber "walked down the steps, walked across the parking lot, jumped across the ditch, walked across Dickerson [Pike] and went right down Darbytown [Drive]." Once the robber left the store, Stokes called 9-1-1 and informed them of the crime.

The police arrived a few minutes after the offense, and approximately an hour to an hour-and-a-half later, Stokes was shown a photographic lineup. The officer informed Stokes that the perpetrator might or might not be included in the lineup and that if she "could point him out to let him know." The officer also told Stokes that the perpetrator's hair might vary from that depicted in a particular photograph. After two or three minutes, Stokes identified Bumpas in photograph number five of the lineup as the perpetrator. Stokes made the following statements regarding her identification of Bumpas in the lineup: "I believe it is him. [I am] 80% [sure]. It looks like his eyes. He is the one who robbed us." Stokes said that she was able to identify Bumpas as the perpetrator, despite the bandana covering his face, because she made eye contact with him several times and was able to observe him during the offense, which lasted several minutes. Stokes also identified Bumpas as the perpetrator at trial, stating that she was one hundred percent sure of her identification. When Stokes was asked to identify a white hat recovered by police near the crime scene, Stokes said it looked like the type of hat the perpetrator was wearing but that she could not be one hundred percent sure that this hat was the same one worn by the perpetrator.

Ronnie Barrett testified that when the robber entered the store, he told him, "Old man you stay in your seat and you won't get hurt." The robber then grabbed the money from the cash drawer and continued to ask for one-hundred-dollar bills. Barrett said that immediately prior to this offense, a young man leaned through the door of the business and asked what he needed to do to obtain a cash advance loan. While this young man was in the store, Barrett had been repaying a loan with four one-hundred-dollar bills.

Barrett said that approximately three minutes after the young man left, the robber entered the Cash and Dash. Barrett described the robber as a "black male gentleman"

- 3 -

who was "wearing a mask and a white hat with a black t-shirt with like silver or white drawings on the t-shirt [that] looked like a dragon and blue jeans." He also said the robber was holding a silver, medium-size automatic pistol in his right hand.

Barrett said that after Doyle ran to the back of the store, the robber pointed his gun at Stokes and took her to the back of the business, where he demanded wallets from Stokes and Doyle and asked for more money. After a few minutes, the robber and Stokes returned to the front of the business. The robber walked toward the door and told Barrett to have a nice day before exiting the business. When Barrett ran over to the window, he saw the robber running across Dickerson Pike.

Barrett immediately exited the business and "jumped in [his] car" to follow him. The robber passed the Subway restaurant across the street before continuing down Darbytown Drive, where Barrett lost sight of him. Three men standing next to the Subway restaurant told Barrett that the man had run farther down Darbytown Drive, and when Barrett drove in that direction, he saw the robber talking to an African American male in a green minivan at the top of the hill.

Barrett said that he "backed up into a driveway, because [he] didn't know if he was going to get in that green van and then come by [him] and start maybe shooting, if he recognized [him]." As Barrett talked to the 9-1-1 dispatcher, the van drove passed him very slowly and then turned right. When the van left, Barrett no longer saw the robber, so he drove to the top of the hill, where he observed the robber again. The robber was no longer wearing the bandana and was standing at the corner wiping sweat from his face. When the robber saw Barrett, he pointed his pistol at him. Barrett quickly drove away but saw the robber run between some houses into the woods toward Devonshire Drive.

Barrett then drove to Devonshire Drive to see if the robber would reappear on that side of the houses, but he never saw him again. Barrett returned to the Cash and Dash and spoke with an officer, although he was never asked to give a formal statement and was never shown a photographic lineup. Barrett said that he did not feel comfortable trying to identify the robber at trial, but when he was asked to identify the white hat collected as evidence, Barrett stated that he was "90 percent certain" that the hat was the one worn by the person who robbed the Cash and Dash on July 3, 2013.

Robert Doyle, an auditor for the State of Tennessee, testified that he went to the back of the store and "laid down in the floor and covered [his] eyes" when the robber entered the Cash and Dash with a gun. He described the weapon as a small silver handgun. When the robber came to the back of the business, he asked Doyle for money, and Doyle told him he "didn't have any." Doyle said that the robber wore a bandana on

- 4 -

his face, but he was unable to observe the robber's eyes. After the offense, Doyle observed the robber running across Dickerson Pike. Doyle stayed at the Cash and Dash until the police arrived but did not speak with the officers and was never shown a photographic lineup. He declined to identify anyone as the robber at trial, stating, "I'm not sure I would even recognize him to be honest."

Jamie Calderon, the manager of the Cash and Dash, testified that on July 3, 2013, she had just sat down at her desk when someone wearing "all black" ran in to business. When she realized what was happening, she walked to an area where the robber could not see her, dialed 9-1-1 on her cell phone, and hid the phone in a box of paperwork.

After the robber left, Calderon picked up her cell phone and spoke to the 9-1-1 dispatcher. Calderon said that the robber wore "black shorts, a black . . . long[-]sleeve [shirt] and a white hat." She was unable to see the robber's face because he had a black "wrap" over it. After he left, she saw the robber running down Darbytown Drive and then saw him "drop something in the ditch," which appeared to be either his "hat or the wrap." Calderon said that she was never asked to look at a photographic lineup because she never saw the perpetrator's face.

Officer Robert Collins, who worked in the K9 unit of Metropolitan Nashville Police Department, testified that on July 3, 2013, he and his police dog responded to the aggravated robbery of the Cash and Dash on Dickerson Pike. Officer Collins went to Darbytown Drive, where a witness had last seen the robber running through some yards. He had been given a description of the robber, including his clothes and race, and he gave his dog the command to track, which led them through some backyards to a wooded area. There, they found "a white ball cap" that matched the description of the one the robber had worn. Officer Collins and his dog continued to track through the wooded area until they reached Westchester Drive, where they had to abandon their search because the area had become contaminated with citizens exiting their homes. Officer Collins identified a white hat collected as evidence and stated that this was the same hat he had found in the woods.

Investigator Mark Rosenfeld of the Metropolitan Nashville Police Department testified that he photographed the crime scene and lifted some latent fingerprints from the cash drawer, although these prints did not result in a match to any individual. Investigator Rosenfeld later collected the white hat found by Officer Collins, taking special care not to contaminate it.

Sergeant Philip Williams of the Metropolitan Nashville Police Department testified that on July 3, 2013, he was talking with a tenant in one of his rental properties

on Westchester Drive, which was approximately a mile from the Cash and Dash and was next door to a home he rented to Mrs. Sonja Stewart, Deewaine Bumpas' mother. At the time, Sergeant Williams was off-duty, was not wearing his police uniform, and had not driven to the area in his patrol car. When Sergeant Williams exited the rental home, he observed a police helicopter circling the area and saw several individuals milling around outside trying to determine what happened. Shortly thereafter, Sergeant Williams observed three or four young men running down Westchester Drive from Dickerson Pike and overheard one of the men say, "D just robbed that place." Sergeant Williams was unable to describe the man who made this statement because he was unsure which of the men had spoken. Although he recognized the young men in this group from the neighborhood, he did not know their names or where they lived. He also said that he did not attempt to stop any of these men because he was trying to determine what had just happened and was unsure where they went. Sergeant Williams knew that Mrs. Stewart, his tenant, had a son who went by the name of "D," so he telephoned her and determined that "D's" real name was Deewaine Bumpas. He acknowledged that this was the only person he knew who went by the name of "D" and that he never investigated anyone else as a possible suspect. Sergeant Williams then called dispatch and was told that the Cash and Dash on Dickerson Pike had just been robbed. He drove to the Cash and Dash and informed Sergeant Steele that Deewaine Bumpas was a possible suspect in this crime. Sergeant Williams stated that on the date of the aggravated robbery offense, he was in the process of evicting Bumpas' family from their home. He acknowledged that the person who said, "D just robbed that place," was both a potential witness and a potential suspect to the crime. He conceded that he never stopped the man who made that statement and never asked him any follow-up questions; however, he asserted that he was simply a witness at the time and had no duty to investigate this statement.

Sergeant Chris Steele of the Metropolitan Nashville Police Department testified that on July 3, 2013, Sergeant Williams approached him at the Cash and Dash and said someone had just told him that "D robbed that store." Sergeant Williams explained that he had a tenant whose son was called "D" and that "D's" real name was Deewaine Bumpas. Sergeant Steele gave Bumpas' name to Detective James Fuqua and Detective Garrett Kidd and asked them to place Bumpas' picture in a lineup that could be shown to the witnesses of the crime.

Detective Garrett Kidd of the Metropolitan Nashville Police Department testified that he took statements from Brittany Stokes and Ronnie Barrett, although he spoke with all of the witnesses to the crime. When he received Deewaine Bumpas' name as a possible suspect, Detective Kidd contacted Detective Fuqua, who created a photographic lineup that included Bumpas' picture. Detective Kidd stated that no one, including Sergeant Williams, knew the identity of the person who had identified the suspect.

- 6 -

Detective Kidd and Detective Fuqua later showed the photographic lineup to Stokes, and Stokes identified Deewaine Bumpas as the robber. Detective Kidd stated that the lineup was not shown to Calderon or Barrett because they indicated they would be unable to recognize the perpetrator.

Detective Kidd later checked to see if there were any businesses or residents with cameras that might have recorded details related to the offense. He determined that the Subway restaurant at the intersection of Dickerson Pike and Darbytown Drive had surveillance cameras that faced both of these roads. Subway's surveillance video was played to the jury. In it, a green minivan matching the description of the vehicle provided by Barrett pulled into Subway's parking lot, which was across the street from the Cash and Dash. Shortly thereafter, an African American male, who was wearing a long-sleeved black top, black shorts, and a white hat walked up Darbytown Drive towards Dickerson Pike and went across the street in the direction of the Cash and Dash. Approximately a second later, the green minivan left the Subway parking lot and turned left on Darbytown Drive, travelling away from Dickerson Pike. Two minutes later, the African American subject ran, at a full sprint, away from the Cash and Dash and toward the area where the green van went down Darbytown Drive. During this sprint, the subject dropped his hat and turned around to pick it up before continuing to run down Darbytown Drive in the direction of the green van until he was out of the camera's view.

Detective Kidd agreed that because of the poor quality of the video, the subject could not be identified. He acknowledged that because of the camera's location, the video did not show the subject entering or exiting the Cash and Dash.

Detective James Davis of the Metropolitan Nashville Police Department identified the white hat found by Officer Collins and testified that he delivered this hat to the Tennessee Bureau of Investigation (TBI) for DNA analysis. He also obtained a DNA sample from Deewaine Bumpas after Bumpas signed a consent form, and he delivered this sample to the TBI so that it could be compared with any DNA found on the cap. Detective Davis stated that he interviewed Bumpas at the police station on July 3, 2013, approximately two hours after the aggravated robbery, and that Bumpas maintained his innocence and was cooperative. Following the interview, Bumpas was not arrested and was allowed to leave. On July 5, 2013, two days later, Bumpas turned himself in to police. Detective Davis noted that while some of the witnesses described the perpetrator as five feet, eleven inches tall and 200 pounds, Bumpas, at the time of his arrest was six feet tall and weighed 215 pounds. Detective Davis added that although officers attempted to locate the green van in the surveillance video, it was never found.

Special Agent Charly Castelbuono, a forensic scientist for the TBI Crime Laboratory, was accepted as an expert in the field of DNA and serology. She conducted a DNA comparison between Bumpas' known DNA sample and the DNA obtained from the white hat recovered near the crime scene. Agent Castelbuono developed a complete DNA profile from Bumpas' sample and determined that DNA sample from the white hat, which was "consistent with a mixture of at least two individuals," showed that the "major contributor matche[d] Deewaine M. Bumpas." She explained that there were two contributors to the DNA on the hat, a major contributor, which was Bumpas, and a minor contributor, whom she was unable to identify because the DNA was too limited to place in the national database. She stated that "[t]he probability of randomly selecting an unrelated individual having the same DNA profile from the African American, Caucasian or Southwestern Hispanic populations, exceeds the current world population."

Agent Castelbuono acknowledged that a major contributor is simply someone who provides "anything more than 51 percent" of the DNA on an item. She admitted that Bumpas could have gotten his DNA on the hat by merely trying it on and that Bumpas' DNA could have been on the hat for days, weeks, or years.

Simone West, Bumpas' twelve-year-old sister, testified that she was ten years old at the time of the aggravated robbery. West said that on July 3, 2013, Bumpas was at their house when she awoke at 9:00 a.m. She said that Bumpas stayed there all morning and that they ate breakfast and watched a movie together. Later that day, their "auntie" and a friend picked them up, and she and Bumpas went to their aunt's home around 1:00 p.m. so West could get her hair fixed. West said that she and Bumpas stayed at her aunt's house until approximately 2:00 p.m. that day. She also confirmed that Bumpas was with her the entire time they were at her aunt's home.

Dr. Jeffrey Neuschatz, who was accepted as an expert in the field of eyewitness identification, testified that he was "a cognitive psychologist" who conducted "research on eyewitness memory and eyewitness identification and jury decision making." Dr. Neuschatz stated that several factors affected the reliability of eyewitness identification, including viewing time, viewing conditions, high stress situations, weapon focus, cross-race identification, and the effects of head-coverings and disguises on memory. He said that a witness could be very confident about an identification, even though the identification was wrong. He also stated that a "double-blind photo lineup," wherein the person conducting the line-up does not know the identity of the suspect and the person viewing the line-up is aware that the person conducting the lineup does not know the identity of the suspect, is the recommended procedure to increase the reliability of identifications. He asserted that a double-blind photographic lineup was not used in this case. Dr. Neuschatz emphasized the problems with eyewitness identifications, stating:

[E]yewitness identification is a difficult task. The usual things that you have to help you remember things are unfortunately not present in these tasks and the fact that there are a lot of issues there like we have talked about, stress, cross-race, head-covering, low exposure time that make it even more difficult to remember people accurately. That is not to say that people don't make accurate identifications, because they do, it is just to say that under these situations it is a very difficult task to do.

Dr. Neuschatz acknowledged that he could not testify about whether Bumpas committed the charged offense or whether Stokes correctly identified Bumpas as the perpetrator.

Detective Davis, who was recalled as a rebuttal witness for the State, testified that he spoke with Bumpas on July 3, 2013. Although Bumpas was not under arrest at the time of this conversation, Detective Davis advised him of his Miranda rights, which Bumpas waived before speaking with him. During the ensuing interview, Bumpas claimed that at the time of the aggravated robbery of the Cash and Dash, he had been "at his auntie's house over on Big Westchester [Drive]." Detective Davis stated that there "is a street . . . within the Madison precinct called Westchester [Drive,] and it is divided into two sections, with one side being "Big Westchester" and the other side being "Little Westchester[,] and it is separated by . . . a field." After talking with Bumpas, Detective Davis determined that Bumpas lived on Little Westchester and Bumpas' aunt lived on a street off of Big Westchester.

The State played a recording of Detective Davis' interview with Bumpas for the jury, periodically stopping the recording to ask Detective Davis questions about how Bumpas' statements to him during the interview varied from the testimony at trial given by Simone West, Bumpas' sister. During this interview, Bumpas told Detective Davis that he had been at his aunt's house on Big Westchester since 8:00 a.m. on July 3, 2013 , but Detective Davis noted that West claimed Bumpas had been with her at home from 9:00 a.m. until they both went to her aunt's house on Big Westchester at 1:00 p.m. In addition, although Bumpas told Detective Davis that he walked across the field to his aunt's house, West testified that someone drove them from their home to their aunt's home on Big Westchester. Bumpas also told Detective Davis that he was only with his two aunts and his aunts' children at Big Westchester on July 3, 2013, and that the only time he left was to come back to Little Westchester to check on his sisters; however, West testified that she was also with Bumpas at Big Westchester that day. Finally, Bumpas claimed that when he awoke on July 3, 2013, his sisters were asleep, and he left to go do his daily routine, but West testified that when she awoke at her home at 9:00 a.m., Bumpas was with her.

## ANALYSIS

I. **Photographic Lineup and Related Testimony.** Bumpas argues that the trial court erred in denying his motion to exclude both the photographic lineup and Sergeant Williams' testimony related to the lineup. He claims that Sergeant Williams' testimony about the photographic lineup was inadmissible hearsay and that the admission of the lineup violated his Sixth Amendment right to confront his accuser.

Bumpas appears to claim that because Sergeant Williams heard an unidentified declarant say, "D just robbed that place" and because Bumpas' photograph was included in the lineup based upon the declarant's unsubstantiated allegation, admission of the photographic lineup at trial violated his Sixth Amendment right to confront the declarant. He asserts that Sergeant Williams "[did] not know who [the declarant] was, did not attempt to speak with [the declarant], did not investigate [the declarant] further" and that Sergeant Williams "admitted that [the declarant] could have been the perpetrator" of the aggravated robbery. Bumpas claims that the photographic lineup is "fruit from the poisonous tree" because it was created based on the "information gleaned from an unknown declarant[,]" and therefore, violates his right to confront his accuser.

A few months prior to trial, Bumpas filed a motion to exclude the photographic lineup and any testimony related to the lineup. At the hearing on this motion, Detective Fuqua testified that Sergeant Steele initially informed him that Sergeant Williams, who owned rental property near the scene, had been told that "D" committed the aggravated robbery of the Cash and Dash. When Sergeant Williams told Sergeant Steele that the person previously identified as "D" was likely Deewaine Bumpas, Detective Fuqua returned to the police station to create a photographic lineup that included Bumpas as a possible suspect. Detective Fuqua said the only reason he included Bumpas in the lineup was because he received Bumpas' name from Sergeant Steele. Detective Fuqua acknowledged that he did not know who identified "D" as the perpetrator and that he never attempted to locate or identify this individual, stating, "I just received [Bumpas'] name, I wasn't aware that person was actually a witness, I took the information received from another officer and if the name was correct[,] I wanted to show the pictures to the people [who] were robbed before much more time passed."

Detective Davis testified that Sergeant Steele told him during a telephone call that Sergeant Williams had developed Bumpas as a possible suspect based on information given to him shortly after the crime. Detective Davis acknowledged that he did not know who identified "D" as the perpetrator of the aggravated robbery. He said that he did not attempt to locate or identify this individual because he was busy doing other duties and believed that Sergeant Williams would know the identity of that individual.

- 10 -

Sergeant Steele testified that while he was standing in the parking lot of the Cash and Dash, Sergeant Williams pulled up and asked if he was investigating a robbery. When Sergeant Steele responded affirmatively, Sergeant Williams said he had received information that "D" robbed the Cash and Dash and that the son of one of his tenants was called "D," though his real name was Deewaine Bumpas. Sergeant Steele later told Detective Fuqua to "look up Deewaine Bumpas and see if he matches, if he does, put him in a line-up." Sergeant Steele said he did not attempt to locate or identify the person who named "D" as the perpetrator because he was supervising the unit and believed the lead detective would investigate this individual.

Sergeant Philip Williams stated that although he was employed with the Metropolitan Nashville Police Department, he was off-duty on July 3, 2013, when the aggravated robbery of the Cash and Dash occurred. Sergeant Williams said he had been doing some maintenance work on his rental property at 1349 Westchester Drive and had just come outside to his truck when he heard someone running down the street, stating, "D just robbed the place up the street." Sergeant Williams did not know who made this identification and did not try to stop the person because he was off-duty at the time and "just overheard somebody yelling as [he] was coming out the door[.]" At the time, there were three or four guys running down the street from the direction of the Cash and Dash, and Sergeant Williams was unsure which individual made the identification. He also believed the person who made this statement was actually yelling to another group of guys down the street. Sergeant Williams added, "I am pretty sure they were not talking to me." He said the atmosphere on the street was chaotic at the time, with numerous people exiting their homes to determine why a police helicopter was circling in the air above them.

Sergeant Williams said he was not wearing his police uniform when the declarant made the statement identifying "D" as the perpetrator and that unless the declarant knew him, he would not have known he was a police officer. He described the men running down the street as "younger black males" ranging in age from seventeen to twenty years old. Upon hearing this statement, Sergeant Williams called dispatch and learned that the Cash and Dash a block away had been robbed just minutes earlier. Sergeant Williams then called one of his tenants, Ms. Sonja Stewart, whom he knew to have a son called "D." Sergeant Williams asked Ms. Stewart where her son was and determined that her son's real name was Deewaine Bumpas. He said he contacted Ms. Stewart because he knew of no other individuals who went by the name of "D" at the time of this offense. He then communicated this information to Sergeant Steele, who was at the scene of the aggravated robbery. Sergeant Williams said he never witnessed the crime and never gave a recorded statement in the case. He said he was not present when Bumpas was interviewed by police or when the witnesses were shown the photographic lineup

- 11 -

containing Bumpas' picture. Sergeant Williams said he had no knowledge about Bumpas' picture being included in the lineup and never attempted to investigate other possible suspects in the aggravated robbery. He stated that he was in the process of evicting Ms. Stewart and her family at the time that the aggravated robbery of the Cash and Dash was committed.

At the conclusion of the hearing, the defense argued that Sergeant Williams' testimony about the declarant's statement identifying "D" as the perpetrator was inadmissible hearsay. It also claimed that even if a hearsay exception applied, the statement should be excluded pursuant to Crawford v. Washington, 541 U.S. 36 (2004). The defense added that the photographic lineup should be excluded as "fruit of the poisonous tree" and that the lineup and the testimony about how it was created should either both be excluded or both be admitted at trial. The State responded that Sergeant Williams' testimony regarding the statement was not hearsay because it was not offered for the truth of the matter asserted and was instead offered to show "the steps . . . taken by the police department" in placing Bumpas' picture in the photographic lineup. However, the State asserted that if the trial court believed the statement was hearsay, then the excited utterance hearsay exception in Rule 803(2) applied. The State also claimed that Crawford would not bar admission of the statement or the lineup because the statement was not testimonial.

In the order denying the motion, the trial court found that neither the photographic lineup nor the identification procedure "was overly suggestive or inappropriate in any way," noting that the defense had never argued otherwise. Regarding the defense's assertion that the information used to create the lineup was inadmissible due to a confrontation issue and that the lineup was tainted as "fruit of the poisonous tree," the court rejected this claim and declined to suppress the lineup because "[t]here was nothing wrong with the photo lineup or the identification procedure used by the police." The trial court refused to address "the admissibility of the statements Sergeant Williams heard and how he came to report [Bumpas] as a suspect" because defense counsel had stated that if the court declined to suppress the photographic lineup, then it did not want the court to suppress the information used to create the lineup.

Initially, Bumpas argues that Sergeant Williams' testimony regarding the declarant's statement is inadmissible hearsay for which no exception applies. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. However, an out-of-court statement does not constitute hearsay evidence if it "'was offered not to prove the truth of its content . . . but . . . to show its effect on the

- 12 -

hearer . . . without regard to its truth or falsity.'" State v. McCoy, 459 S.W.3d 1, 11 (Tenn. 2014) (quoting State v. Furlough, 797 S.W.2d 631, 647 (Tenn. Crim. App. 1990)).

The Tennessee Supreme Court has held that the appellate standard of review for rulings on hearsay evidence consists of multiple layers:

> Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. State v. Gilley, 297 S.W.3d at 760-61. Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one of the exceptions to the hearsay rule—are questions of law subject to de novo review. State v. Schiefelbein, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); Keisling v. Keisling, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005).

Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015).

Initially, we note that Bumpas has waived this issue by asserting at the hearing that if the trial court refused to suppress the photographic lineup, then it did not wish for the trial court to suppress the information used to create the lineup, including Sergeant Williams' testimony about the declarant's statement. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Waiver notwithstanding, we acknowledge that the declarant's statement that "D just robbed that place" was hearsay, even though the State claimed it was offered to show why his photograph was included in the lineup. Here, Bumpas argues that a photographic lineup that is based on hearsay is inadmissible. However, Bumpas provides us with no authority for this proposition, and we have found none. While we reject the State's attempt to introduce hearsay based on contextual or background evidence, given the other proof of Bumpas' guilt; namely, the store clerk's identification and Bumpas' DNA found on the white hat worn by the perpetrator, any error in the admission of the statement was harmless.

Bumpas also argues that even if Sergeant Williams' testimony is admissible under the Tennessee Rules of Evidence, the state and federal constitutional right of confrontation preclude the admission of this testimony at trial. The Confrontation Clause of the Sixth Amendment to the United States Constitution gives an accused the right "to be confronted with the witnesses against him," and this right is applicable to the States through the Fourteenth Amendment. U.S. Const. amend VI, XIV. The Tennessee Constitution also gives an accused the right "to meet the witnesses face to face." Tenn. Const. art. I, § 9. The Tennessee Supreme Court has held that when determining whether a court may admit prior statements of a declarant as evidence against a defendant, this provision of the Tennessee Constitution "does not impose any restrictions on admitting hearsay statements beyond those of the Sixth Amendment, as interpreted by Crawford and its progeny." McCoy, 459 S.W.3d at 13-14. Therefore, "[i]n deciding issues under the Confrontation Clause in the Tennessee Constitution, we apply the same analysis used to evaluate claims based on the Confrontation Clause of the Sixth Amendment to the United States Constitution." State v. Hutchinson, 482 S.W.3d 893, 905 (Tenn. 2015); see State v. Dotson, 450 S.W.3d 1, 62 (Tenn. 2011); State v. Parker, 350 S.W.3d 883, 897-98 (Tenn. 2011). Whether the admission of certain evidence violates a defendant's confrontation rights is a question of law subject to de novo review. McCoy, 459 S.W.3d at 8 (citing State v. Lewis, 235 S.W.3d 136, 141-42 (Tenn. 2007)).

The threshold question in every case involving the Confrontation Clause is whether the challenged statement is testimonial. Hutchinson, 482 S.W.3d at 905 (citing Dotson, 450 S.W.3d at 63); see State v. Cannon, 254 S.W.3d 287, 301 (Tenn. 2008); Crawford, 541 U.S. at 51-52. In Crawford, 541 U.S. at 68, the United States Supreme Court held that testimonial out-of-court statements by a nontestifying declarant may be admitted only if the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. The Court noted that "[t]he text of the Confrontation Clause . . . applies to witnesses against the accused—in other words, those who bear testimony." Id. at 51 (internal quotation marks omitted). It then defined "testimony" as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." Id. (internal quotation marks omitted). The Court then provided the following examples of statements that are testimonial:

> Various formulations of this core class of "testimonial" statements exist: "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," . . . "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,"

- 14 -

"statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," . . . . These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition—for example, ex parte testimony at a preliminary hearing.

Id. at 51-52 (citations omitted); see Dotson, 450 S.W.3d at 63-64. While "[s]tatements taken by police officers in the course of interrogations" qualify as testimonial, "off-hand, overheard remark[s]," "statements in furtherance of a conspiracy," and "business records" are nontestimonial under Crawford. Crawford, 541 U.S. at 51-52, 56; see McCoy, 459 S.W.3d at 14.

In Hutchinson, 482 S.W.3d at 910, the Tennessee Supreme Court held that when determining whether an out-of-court statement is testimonial, the court must first determine whether the statement's "primary purpose is to prove past events potentially relevant to a criminal prosecution." Once this threshold is met, the court must consider (1) whether the statement has "indicia of solemnity," as outlined in Justice Thomas' separate concurrence in Williams, or (2) whether the primary purpose of the statement was to accuse a targeted individual, in accordance with Justice Alito's plurality in Williams. Id. (citing Williams v. Illinois, 567 U.S. 50, 82, 110-11 (2012)). The Hutchinson court held that if the statement "meets the threshold standard and either of the latter two standards, it is considered testimonial within the meaning of the Confrontation Clause." Id. at 910-11.

In this case, the declarant made the spontaneous statement, "D just robbed the place up the street," as he was running with a group of men down the street. The declarant's basis of knowledge for this information was never provided, and the statement was not made in response to anything Sergeant Williams said to the declarant. When asked whether the declarant made this statement to him directly, Sergeant Williams replied, "I am pretty sure they were not talking to me."

At the time this statement was made, Sergeant Williams was not in police uniform because he was off-duty; he had also driven his truck, rather than his patrol car, to the area because he was off-duty and working on one of his rental properties. Sergeant Williams acknowledged that unless the declarant knew who he was, he would not have realized that he was a police officer at the time he made the statement. He candidly admitted that he could not determine which man in the group made the statement. Sergeant Williams said he did not personally know any of the men in this group, and

- 15 -

although he had seen some of the men around the neighborhood, he did not know any of their names or where they lived.

The lack of formality surrounding the statement also indicates that the statement is nontestimonial. The spontaneous statement, which was made by the declarant as he was running down the street, was not given under circumstances akin to a deposition, affidavit, testimony, or a confession. The statement was not recorded, was not provided during a custodial examination, and was not made in response to any question or statement by Sergeant Williams. Given all of these circumstances, we simply cannot conclude, under the threshold standard stated in Hutchinson, that the primary purpose of the declarant's statement was to serve as proof in a criminal prosecution. Because the declarant's statement was not testimonial under the Confrontation Clause, it was properly admissible at trial. Moreover, because the police properly included Bumpas' picture in the lineup based on this statement, we conclude that the trial court's denial of the motion to exclude the photographic lineup was proper.

**II. Surveillance Video.** Bumpas also argues that the trial court erred in denying his motion to exclude the surveillance video and related testimony pursuant to Tennessee Rule of Criminal Procedure 16 and Brady v. Maryland, 373 U.S. 83 (1963). He claims, without explanation, that because the court refused to exclude this evidence, "he was forced to choose between exercising his right to a speedy trial, guaranteed under the Sixth Amendment to the United States Constitution, . . . and potentially being provided with ineffective assistance of counsel at his trial due to prejudicial surprise."

On October 23, 2015, the defense filed a motion to exclude the surveillance video and related testimony pursuant to Rule 16 and Brady, based on the State's late disclosure of this evidence. At the hearing on this motion just prior to trial, defense counsel stated that although the prosecutor had given her a disk containing the surveillance video from the Subway restaurant across the street from the Cash and Dash several months prior, the video could not be viewed. Defense counsel immediately notified the State regarding this issue, and the prosecutor assured her that she would not use the surveillance video in the State's case-in-chief. However, the Friday before the start of trial, the prosecutor informed defense counsel that she had been able to view the surveillance video and intended to present it as proof at trial. Defense counsel and the prosecutor were able to view the video together, and the prosecutor gave defense counsel another copy of the surveillance video, but once again, the defense was unable to view the video, and defense counsel informed the State about the continuing issues regarding the video.

Defense counsel asked that the surveillance video be excluded because she was not made aware that the State intended to present the video in its case-in-chief until three

days prior to trial. However, defense counsel stated that regardless of the court's ruling regarding her request to exclude the video, she wished to move forward with the trial that day and did not wish to continue the trial to a later date.

The prosecutor explained that with the help of her office's Internet Technology specialist, she was able to view the video. Upon viewing it, she determined that the video was extremely probative because it corroborated the statements given by several of the witnesses, even though it did not clearly identify the person running across the road just after the aggravated robbery. The prosecutor suggested that the defense be given a short continuance in order to prepare for the video to be shown to the jury at trial.

In ruling on the motion to exclude, the trial court noted that the defense never argued that the State had acted in bad faith and that the only issue was whether the defense would receive a remedy given the late disclosure of the video. Ultimately, the trial court made the following ruling:

> I believe under all of the circumstances that it would not be in the interest of justice if we are seeking the truth, which is what the purpose of the trial is, to exclude the video since the State did nothing and was not at fault about this late notice, so the Court is of the opinion that the appropriate remedy would be a continuance if there is anything.

After confirming that defense counsel did not desire a continuance and wanted to proceed to trial that day, the trial court stated, "I don't think there was any bad faith on the part of the State about this, and I think if it is probative and they seem to think it is then it should be admitted[.]"

First, Bumpas argues that he should have been given the opportunity to inspect and copy the surveillance video pursuant to Tennessee Rule of Criminal Procedure 16(a)(1)(G).[2] Rule 16(a)(1)(G) provides:

> Reports of Examinations and Tests. Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph the results or reports of physical or mental examinations, and of scientific tests or experiments if:
>
> (i) the item is within the state's possession, custody, or control;

---

[2] While Bumpas's claim would have been more appropriately raised under Rule 16(a)(1)(F), which pertains to "Documents and Objects," we will address the issue as presented.

(ii) the district attorney general knows—or through due diligence could know—that the item exists; and
(iii) the item is material to preparing the defense or the state intends to use the item in its case-in-chief at trial.

Although not specifically raised by Bumpas, we recognize that Rule 16(c) imposes a continuing duty on the State to promptly disclose the existence of additional evidence or material discovered before or during trial if "(1) the evidence is subject to discovery or inspection under this rule, and (2) the other party previously requested, or the court ordered, its production." Tenn. R. Crim. P. 16(c). Whether a defendant has been prejudiced by the State's failure to disclose evidence is vital in determining the proper remedy. State v. Smith, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995).

Here, as soon as the prosecutor was able to view the surveillance video, she informed defense counsel of this fact and told her that she intended to present it as proof at trial. Shortly thereafter, defense counsel and the prosecutor viewed the video together, and the prosecutor gave defense counsel another copy of the surveillance video, which through no fault of the State, the defense was again unable to view. At the hearing, defense counsel asked that the video be excluded on the basis of the late disclosure but declined to request a continuance. Because a continuance would likely have been an appropriate remedy in this case, defense counsel risked waiver by failing to seek a continuance. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). In any event, we note that the exclusion of evidence, although necessary in some cases, is a "'drastic remedy and should not be implemented unless there is no other reasonable alternative.'" State v. Gann, 251 S.W.3d 446, 457 (Tenn. Crim. App. 2007) (quoting Smith, 926 S.W.2d at 270). Although Bumpas claims the trial court should have excluded the video based on the State's late disclosure of this proof, he has failed to show what he would have done differently had he been given additional time to review the video prior to trial. While we acknowledge that Rule 16(d) provides the trial court with a variety of remedies, we conclude that the trial court did not err in denying the request that the surveillance video be excluded.

Second, Bumpas alleges that the surveillance video and related testimony should have been excluded pursuant to Brady. Specifically, he claims:

> that a working copy of the disc should have been provided to defense counsel prior to the eve of trial; that all of the information contained on the video was material to preparing the defense; that receiving the information

- 18 -

prior to October 23, 2015 (three days before trial) would have avoided prejudicial surprise prior to trial; and that [he] was not given the appropriate opportunity to prepare defenses for a case that was pending for more than two years and was set for trial three days after receiving a "working copy" of the disc containing surveillance video to be used by the State in its case-in-chief at trial.

In interpreting Brady, the United States Supreme Court held, "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999); see Dotson, 450 S.W.3d at 94. We fail to see how the surveillance video is favorable to Bumpas because it is neither exculpatory nor impeaching with regard to the State's witnesses. The video corroborates the witnesses' descriptions of the perpetrator and fails to rule out Bumpas as the individual who committed the aggravated robbery. As to the second and third prongs in Strickler, we conclude that the evidence was not suppressed by the State because it was actually provided to the defense and that Bumpas has failed to show how he was prejudiced by the late disclosure of this evidence.

In addressing the difference between delayed disclosure and nondisclosure of evidence, this court held:

> Indeed, when there has been a delayed disclosure of evidence, as opposed to a complete non-disclosure, Brady is normally inapplicable unless the delay itself causes prejudice. When there has been a delayed disclosure, as opposed to a non-disclosure, the appellant must establish that the delayed disclosure prevented him from using the disclosed material effectively in preparing and presenting his case. Moreover, if the appellant failed to move for a continuance after receiving the information, [failed to] thoroughly cross-[examine] the witness(es) regarding the evidence, or failed to call or recall an available witness concerning the exculpatory statements, the potential Brady violation may be cured.

State v. Larry Boykin, No. E2005-01582-CCA-R3-CD, 2007 WL 836807, at *13 (Tenn. Crim. App. Mar. 20, 2007) (citations omitted).

Bumpas has not explained what he would have done differently to prepare or present his case for trial had the video been made available to him earlier, and we have found no case in Tennessee that expands "suppression" for the purposes of a Brady

- 19 -

violation to include a late disclosure of evidence where the defendant suffered no prejudice. See State v. Carlos Radale Cornwell, No. E2011-00248-CCA-R3-CD, 2012 WL 5304149, at *21 (Tenn. Crim. App. Oct. 25, 2012). Moreover, when the trial court offered to continue the case to allow additional time to prepare, defense counsel declined, effectively curing any potential Brady violation as to this evidence. See Larry Boykin, 2007 WL 836807, at *13. For all of these reasons, Bumpas is not entitled to relief.

**III. Questions Regarding Sergeant Williams' Personnel Record.** Bumpas contends that the trial court's decision to sustain the State's objection to defense counsel's questions regarding Sergeant Williams' personnel record violated his right to confront the witnesses against him. He claims, without elaboration, that the State's objection should not have been sustained because "defense counsel was attempting to show a pattern of behavior on Sergeant Williams' behalf and . . . a bias as to [his] family specifically."

At trial, defense counsel asked Sergeant Williams if he had had some trouble in the past with evicting tenants, and the State objected, claiming that this line of questioning was irrelevant. During the ensuing bench conference, defense counsel said she had asked the question because Sergeant Williams' personnel file showed that he had been "disciplined for trying to illegally evict a tenant." She added that this tenant had nothing to do with Bumpas' case but that the information was relevant in this case because Sergeant Williams may have identified Bumpas as the perpetrator only because he was trying to evict Bumpas' parents from his rental property. The State responded that this evidence was "not relevant to this case," had "nothing to do with [Sergeant Williams'] credibility," and had "nothing to do with his veracity." Ultimately, the trial court allowed the defense to question Sergeant Williams about the eviction proceedings against Bumpas' parents but stated, "I don't think we need to go back to 2011 or something."

The Confrontation Clause of the Sixth Amendment and Article I, section 9 of the Tennessee Constitution provide a criminal defendant with the right to conduct meaningful cross-examination of the witnesses against him. State v. Brown, 29 S.W.3d 427, 431 (Tenn. 2000). However, "'the Confrontation Clause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" State v. Davis, 466 S.W.3d 49, 68 (Tenn. 2015) (quoting United States v. Owens, 484 U.S. 554, 559 (1988)). Consequently, a defendant's right to confront witnesses "does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confrontation, witness safety, or merely repetitive or marginally relevant interrogation." State v. Reid, 882 S.W.2d 423, 430 (Tenn. Crim.

App. 1994); see State v. Sheline, 955 S.W.2d 42, 47 (Tenn. 1997) (noting that a defendant's right to confront and cross-examine witnesses "does not mean that a defendant has a right to present irrelevant evidence"). Because "[t]he propriety, scope, manner and control of the cross-examination of witnesses . . . rests within the sound discretion of the trial court," we will not disturb the limitations placed on cross-examination unless the trial court has unreasonably restricted that right. State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995)

Here, the record shows that the trial court did not unreasonably restrict Bumpas' right to cross-examine Sergeant Williams about his personnel record. We agree that proof that Sergeant Williams had been disciplined for attempting to illegally evict a tenant in 2011 was irrelevant to whether he was biased against Bumpas and his family. See Tenn. R. Evid. 401 (providing that "relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"); Tenn. R. Evid. 402 (stating that "[e]vidence which is not relevant is not admissible"); Tenn. R. Evid. 616 ("A party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness."). The trial court allowed defense counsel to fully explore the fact that Sergeant Williams was in the process of evicting Bumpas' family at the time he provided Bumpas' name as a possible suspect in the aggravated robbery. Because the trial court did not abuse its discretion in sustaining the State's objection to this line of questioning, Bumpas is not entitled to relief.

**IV. <u>Denial of Mistrial.</u>** Bumpas argues that the trial court erred in denying his motion for a mistrial following his objection to the recording of his police interview referencing his appearances in juvenile court for fighting. He claims that although this juvenile behavior did not result in a conviction, it constituted prior bad acts under Tennessee Rule of Evidence 404(b). He adds that because the probative value of this evidence was outweighed by the danger of unfair prejudice, the evidence should never have been presented to the jury, and the trial court should have granted his motion for a mistrial.

During rebuttal, the State recalled Detective James Davis, who testified about his interview with Bumpas the day of the aggravated robbery. The State also played a recording of this interview for the jury, stopping it at certain points to ask Detective Davis about the differences between Bumpas' statements during the interview and Simone West's testimony at trial. During this recording, which is not included in the record on appeal, Bumpas apparently indicated that he had gotten into fights as a juvenile, which required him to appear in juvenile court.

- 21 -

Upon hearing this portion of the recording, defense counsel asked for a bench conference, stating, "Your Honor, they are getting into [Bumpas'] prior record[,] and they are talking about prior acts. . . . I mean, they just made a statement about his juvenile record." During the subsequent jury-out hearing, the defense moved for a mistrial because of the references to Bumpas' juvenile record. The trial court noted that although Bumpas admitted he "had some juvenile issues and [had] got[ten] in some trouble for fighting," there was no mention that he had received any convictions. Although the trial court declined to grant the request for a mistrial, it suggested that a curative instruction could be given, which was agreeable to the defense, and the trial court provided the following instruction to the jury:

> Members of the jury, we are going to pick up with the rest of the tape, but before we do I want to mention one thing to you, when we were listening to that tape the State was bringing that in for what they consider rebuttal and so that is your view as to what it is and what it isn't on that issue, but there was a quick little brief reference in there about something about the defendant in here having some issue when he was a juvenile, getting into a little trouble fighting or something along that line, there was nothing in there about any convictions that he had or anything and in fact that was in there that he didn't have any convictions, so I want you to be sure to understand that that should have no reference or bearing on anything that you do in this trial, the fact that he had some mix up as [a] juvenile and got into this little fight or something[,] that shouldn't be anything that you can consider or give any thought to in your deliberations. That is completely separate from what we are here about, so just please if you would just ignore that, do not consider that in any manner against this defendant and then whatever other part of the tape that they are playing for another reason is the only thing that really should have been brought out, so does everybody understand that okay?

Because the record does not include the recording of the interview or a transcript from this recording, Bumpas has waived this issue. The appellant has a duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). "In the absence of an adequate record on appeal, we must presume that the trial court's ruling was supported by the evidence." State v. Bibbs, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991) (citing Smith v. State, 584 S.W.2d 811, 812 (Tenn. Crim. App. 1979); Vermilye v. State, 584 S.W.2d 226, 230 (Tenn. Crim. App. 1979)). This court cannot review the court's decision to deny the request for a mistrial without considering the recorded interview heard by the jury at trial. In light of Bumpas' failure to provide an adequate

- 22 -

record, we must presume that the trial court's decision to deny a mistrial and to issue a curative instruction was proper.

**V. Sufficiency of the Evidence.** Bumpas also asserts that the evidence presented at trial is insufficient to sustain his conviction. Specifically, he claims that because another person's DNA was found on the white hat recovered by police, there was insufficient proof establishing his identity as the perpetrator.

"The identity of the perpetrator is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. State v. Cribbs, 967 S.W.2d 773, 779 (Tenn. 1998). Identity may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing Strickland, 885 S.W.2d at 87).

In this case, Simone West, Bumpas' sister who was ten years old when the aggravated robbery occurred, testified that she was with Bumpas at the time of the crime, thereby presenting an alibi defense. However, a jury may reject an alibi defense. State v. Cate, 746 S.W.2d 727, 729 (Tenn. Crim. App. 1987). "The defense of alibi presents an issue of fact determinable by the jury, as the exclusive judges of the credibility of the witnesses in support of that defense, and of the weight to be given their testimony." State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982) (citing Green v. State, 512 S.W.2d 641, 643 (Tenn. Crim. App. 1974)); see Forbes v. State, 559 S.W.2d 318, 324 (Tenn. 1977). In this case, the jury, by convicting Bumpas, rejected the alibi defense offered by West, as was its prerogative.

Moreover, although Bumpas claims that the State failed to establish his identity as the perpetrator, Brittany Stokes twice identified him as the individual who committed the aggravated robbery at the Cash and Dash on July 3, 2013. Stokes testified that she was able to observe Bumpas' face for approximately thirty seconds before he pulled the bandana over his mouth and nose. She also stated that she made eye contact with him and was able to observe him during the entirety of the aggravated robbery. A few hours after the aggravated robbery, Stokes identified Bumpas as the perpetrator from a

- 23 -

photographic lineup. She also identified Bumpas as the perpetrator at trial. Although Stokes's eyewitness testimony alone is sufficient to sustain Bumpas' conviction, her testimony is corroborated by the DNA belonging to Bumpas that was found on the white hat discovered by Officer Collins as he was pursuing the perpetrator. Special Agent Charly Castelbuono testified that the DNA sample from the white hat, which was "consistent with a mixture of at least two individuals," showed that the "major contributor matche[d] Deewaine M. Bumpas." Considering this DNA evidence in conjunction with Stokes's eyewitness testimony, we conclude that the evidence is more than sufficient to establish Bumpas' identity as the perpetrator in this case.

VI. **Sentencing.** Bumpas argues that the trial court erred in sentencing him to the maximum sentence of twelve years rather than the minimum sentence of eight years for his aggravated robbery conviction. Although he concedes that his criminal history included one prior felony conviction, he claims it should not have been used to enhance his sentence to the top of the sentencing range given that this conviction was not "in addition to those necessary to establish the appropriate range." T.C.A. § 40-35-114(1). He also asserts that because the trial court gave little weight to the fact that he admitted to underage drinking and marijuana use, these admissions were also insufficient to enhance his sentence to the maximum in the range. Finally, Bumpas claims that his sentence was excessive because the trial court erroneously applied the enhancement factor in Tennessee Code Annotated section 40-35-114(3), that "[t]he offense involved more than one (1) victim," because Brittany Stokes was the only individual who met the definition of a "victim" as outlined in State v. Raines, 882 S.W.2d 376, 384 (Tenn. 1994).

At Bumpas' sentencing hearing, Brittany Stokes stated that at the time of the aggravated robbery, she was twenty-five years old and had worked at the Cash and Dash for nearly two years. When Bumpas pointed the gun at her head, she "was scared" and "was just praying that [she] was going to live for . . . [her] child at the time." Stokes stated that Bumpas ordered her at gunpoint to go to the back of the building with him and that he also pointed his gun at Ronnie Barrett and Robert Doyle.

Stokes said that after her employer refused to improve safety and security for its employees, she left her job at Cash and Dash and was unable to find another job for several months. She stated, "I almost lost my house . . . because I could not go back to work and get a paycheck to pay my bills and I was off for over six months with nothing, no kind of income." After the incident, Stokes was admitted to a hospital and later saw a psychiatrist, who diagnosed her with Post Traumatic Stress Disorder, Anxiety, and Depression and prescribed several medications for her. Stokes said her husband of eleven years nearly left her because of "the stress and the depression and the medication"

- 24 -

she was taking related to the aggravated robbery. Stokes asserted that the aggravated robbery also impacted her daughter:

> She slept in my bed for two or three months. She wouldn't leave my side. I almost had to put her in some counseling. She was scared to death to go anywhere. She would sit in her house, in our house, in her room and think of ways to protect herself if something like that were to happen at our house.

Bumpas' mother, Sonja Stewart, asked the trial court to "please show mercy on [her] son." She stated, "I feel bad for what happened to Ms. Stokes and I do pray that she finds healing and I also ask for mercy on my son as well." Finally, Stewart said, "I love my son and I am going to support my son to the end." Other members of Bumpas' family appeared at the sentencing hearing to support him.

Deewaine Bumpas provided the following allocution to the court: "I would like to say I am sorry to the victim for everything that she has been through and I ask you to show leniency on the time that you are about to hand down now."

During the sentencing hearing, the State argued that enhancement factor (1), that Bumpas had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," was applicable because

> the defendant was actually found guilty in this court for . . . aggravated assault in an event that occurred after the defendant was arrested in this case. While he was in jail, he participated in a brutal beating of a man because he was a witness in a case and was to testify against another person who either the defendant knew or one of his associates knew and for that reason that person was beaten.

In addition, the State noted that Bumpas admitted in the presentence report that he had "used illegal drugs on occasion," which also supported the application of enhancement factor (1). The defense maintained that mitigating factor (13) should be applied because Bumpas had no criminal record when he committed the offense in this case, because Bumpas cooperated fully with the investigation, and because Bumpas turned himself in to the authorities. See T.C.A. § 40-35-113(13).

Citing State v. Jordan, 116 S.W.3d 8, 24 (Tenn. Crim. App. 2003), the trial court applied enhancement factor (1) on the basis that criminal behavior or convictions occurring before the sentencing hearing may qualify as a previous history of criminal

convictions or criminal behavior regardless of whether the convictions or behavior occurred before or after the criminal conduct at issue. See T.C.A. § 40-35-114(1). The court noted that Bumpas had been charged in a unrelated case with committing the felonies of attempted first degree murder, criminally negligent homicide, and retaliation for past action on September 24, 2013, which was after the offense in this case, and that while the attempted first degree murder and retaliation charges had been dismissed, Bumpas had been convicted of aggravated assault, rather than the charged offense of criminally negligent homicide, and had been sentenced to two years with one month to serve on July 16, 2014. The court also considered, to a lesser degree, Bumpas' admissions in the presentence report to underage alcohol and marijuana use. The court also applied enhancement factor (3), that "[t]he offense involved more than one (1) victim," because individuals other than Stokes were present at the time of the aggravated robbery and were threatened and held at gunpoint. See id. § 40-35-114(3). The trial court declined to apply any mitigating factors in this case.

Before imposing Bumpas' sentence, the court said it particularly considered the effect of this crime on Brittany Stokes:

> I hear Ms. Stokes and, obviously, every time I hear a case like this I always feel for the family, the mothers, grandmothers, aunts, whoever it is that are here, wives, and they speak up for their son or whatever it is and that is all fine and I respect every person in here from [Bumpas'] family, but I am looking at a matter here where this woman was scared half to death, her life has been affected for two or three years after it, it has affected her family, her little daughter and everything else and while I have been asked to have mercy for the defendant, frankly, with all due respect, I have more mercy for Ms. Stokes[,] she is the one that was put through something through no fault of her own, just going to work and trying to make an honest living out there and having a gun put right next to her head and scared half to death.

After recognizing that Bumpas was a Range I offender and that his sentencing range for the aggravated robbery conviction was eight to twelve years, the trial court imposed a sentence of twelve years. See T.C.A. § 40-35-112(a)(2).

Initially, we note that the 2005 amendments to the sentencing act "served to increase the discretionary authority of trial courts in sentencing." State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In light of this broader discretion, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." Id. at 706. The

amendments to the sentencing act also "rendered advisory the manner in which the trial court selects a sentence within the appropriate range, allowing the trial court to be guided by–but not bound by–any applicable enhancement or mitigating factors when adjusting the length of a sentence." Id. Because of this broader discretion,

> a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005. So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld.

Id. Accordingly, this court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following when determining a defendant's specific sentence:

(1)    The evidence, if any, received at the trial and the sentencing hearing;
(2)    The presentence report;
(3)    The principles of sentencing and arguments as to sentencing alternatives;
(4)    The nature and characteristics of the criminal conduct involved;
(5)    Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6)    Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
(7)    Any statement the defendant wishes to make in the defendant's own behalf about  sentencing.

T.C.A. § 40-35-210(b). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d), Sentencing Comm'n Cmts. The trial court shall impose "a sentence justly deserved in relation to the seriousness of the offense[.]" Id. § 40-35-102(1). The court must consider the defendant's potential for rehabilitation or treatment. Id. §§ 40-35-102, -103. In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. §§ 40-35-

103(2), (4).

Bumpas contends that his sentence should not have been enhanced to the maximum within the range because his single conviction for aggravated assault did not qualify as a conviction "in addition to those necessary to establish the appropriate range." Id. § 40-35-114(1). As we understand this argument, Bumpas claims that the trial court erred in using his single prior conviction both to establish his Range I offender status and to apply enhancement factor (1). We reject this argument outright because Bumpas would have been sentenced as a Range I, standard offender regardless of whether he had a prior conviction. See id. §§ 40-35-105; 40-35-109, Sentencing Comm'n Cmts ("If a defendant has little or no prior criminal record, such defendant would normally be sentenced within Range I as a standard offender."); 40-35-109(a) (stating that a trial court may sentence a defendant as an especially mitigated offender if the defendant has no prior felony convictions and the court finds mitigating but no enhancement factors). Therefore, we conclude that the trial court was free to consider this conviction in applying enhancement factor (1) and to impose the maximum sentence in the range based on this enhancement factor. See Bise, 380 S.W.3d at 701.

Bumpas also argues that the trial court erred in applying enhancement factor (3), that "the offense involved more than one (1) victim." Id. § 40-35-114(3). The State concedes that the court erred in applying this factor. In Raines, 882 S.W.2d at 384, this court held that the term "victim," as used in Tennessee Code Annotated section 40-35-114(3), "is limited in scope to a person or entity that is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime." After considering the proof presented at trial, Brittany Stokes is the only individual who meets this definition. Therefore, we agree that the trial court erred in applying enhancement factor (3).

Nevertheless, after reviewing the record, we conclude that the trial court did not abuse its discretion in sentencing Bumpas to twelve years of incarceration. Although the trial court erred in applying enhancement factor (3), the misapplication of an enhancement factor alone does not invalidate a sentence unless the trial court wholly departed from the sentencing act, which was not the case here. See Bise, 380 S.W.3d at 706. We conclude that the trial court's application of enhancement factor (1) and its recognition of how this crime impacted Brittany Stokes provide a sufficient basis for the trial court's imposition of a within-range, twelve-year sentence. Because the fully record supports the imposition of a maximum sentence in this case, Bumpas is not entitled to sentencing relief.

**VII. Denial of Motion for New Trial.** Finally, Bumpas generally contends that the trial court abused its discretion in denying his motion for new trial but fails to provide

any specific argument or authorities in support of this claim. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." See Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7) (A brief shall contain "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on."). Failure to comply with this basic rule will ordinarily constitute a waiver of the issue. State v. Willis, 496 S.W.3d 653, 716 (Tenn. 2016) (citing State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997)).

In any case, we note that the decision to deny a motion for new trial is within the trial court's sound discretion. See Tenn. R. Crim. P. 33(a). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." State v. Scott, 275 S.W.3d 395, 404-05 (Tenn. 2009). We have rejected each of Bumpas' assignments of error on appeal, which were the same issues that he raised in his motion for new trial. Accordingly, we conclude that the trial court acted within its discretion in denying Bumpas' motion.

## CONCLUSION

Based on the aforementioned authorities and reasoning, the judgment of the trial court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE